United States Bankruptcy Court
Northern District of Illinois
Eastern Division

| | |
|---|---|
| In re: William W. Yotis III,<br><br>Debtor. | Bankruptcy No. 14-bk-02689 |
| Anthony C. Gasunas,<br><br>Plaintiff<br>v.<br>William W. Yotis III,<br><br>Defendant. | Chapter 13<br><br>Adversary No. 14-ap-00321 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON GASUNAS'S AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

This adversary proceeding, filed in a voluntary chapter 13 bankruptcy case, is before this Court for decision after trial. Anthony C. Gasunas ("Gasunas") filed a complaint to determine dischargeability of the debt owed to him by the defendant, William W. Yotis, III ("Yotis"). After two of four counts pleaded were dismissed, remaining Counts I and II in the First Amended Complaint were tried. Count I alleged a nondischargeable judgment debt pursuant to § 523(a)(2)(A) and § 523(a)(2)(B). Count II objected to discharge of a debt under § 523(a)(4). The Complaint alleged that Yotis made knowing and fraudulent misrepresentations to borrow money from Gasunas.

Yotis did not dispute that a Promissory Note was signed by him, but denied any misrepresentations and argued that any reliance was not justifiable. He also claimed that Gasunas knew the terms and debt stated in the Promissory Note were false when it was signed.

Following trial on the evidence, both parties having rested and submitted final arguments in the form of Proposed Findings of Fact and Conclusions of Law, the Court now makes and enters its Findings of Fact and Conclusions of Law. As discussed below, the evidence at trial established a series of misrepresentations by Yotis in obtaining loans from Gasunas, and that reliance on those misrepresentations was justifiable. Accordingly, Judgment will be entered for the plaintiff Gasunas on Count I under § 523(a)(2)(A).

Judgment on Count II will be entered in favor of the defendant's favor, in accordance with the factual findings and conclusions of law that follow.

## FINDINGS OF FACT

Trial on Gasunas's nondischargeability claims was held over five afternoons. Both Gasunas and Yotis testified. At the conclusion of trial, both parties submitted written final arguments that adequately represented the sequence of events and testimony presented at trial. (*See Pl.'s Final Arg.*, Dkt. No. 152; *Def.'s Final Arg.*, Dkt. No. 154; *Pl.'s Rebuttal*, Dkt. No. 155.) As discussed below, the testimony given by Yotis was not credible. Gasunas's version of the events is found to be better supported by his credibility and by the evidence at trial. Not only did Yotis's conduct as a con artist make it difficult to believe his remarkable version of events, but his testimony was inconsistent. The credible evidence gives rise to the findings that follow.

### 1. The Judgment Debt and Background of the Parties' Relationship.

Over the course of about one year, from May 2009 to July 2010, Yotis solicited a number of loans from Gasunas totaling indebtedness of $52,345.00. Yotis never repaid these amounts, though he had given Gasunas a Note promising to pay. As a result, Gasunas filed suit in state court and subsequently secured a judgment by default for $52,345.00, plus costs of $337.00, for a total judgment of $52,682.00 against Yotis (the "Judgment"). (*See* Trial Stipulations, Dkt. No. 115 [hereinafter *Stip*] ¶¶ 4 and 5; PX. 1 and 2.)

Gasunas and Yotis were supposedly friends at the time the loans giving rise to the Judgment were extended. Although the exact circumstances and the time when the two met are unclear, both Gasunas and Yotis testified that they first met sometime during or about 2007. The two met through Yotis's wife, Karen Cavello ("Cavello"). Gasunas and Cavello frequented the same Starbucks establishment and formed a friendship. (*Stip.* ¶ 6.) Throughout the course of this association, and prior to meeting Yotis, Gasunas learned from Cavello that Yotis had been disbarred as an attorney years before but had gotten his life back together as a salesman for Loop Construction, a remodeling company. (*Id.* ¶ 7.) Cavello also

2

told Gasunas that Yotis had been incarcerated on what she said were false charges involving a politician, the building trades, and dealings with a specified contractor. (*Id.*)

Yotis and Gasunas eventually met and became friendly. Both parties attribute this friendship to a shared love of chess. (*See Answer to First Am. Compl.* ¶ 10.) There is no dispute that the parties engaged in close and personal communications as a result of this friendship.

Shortly after Yotis and Gasunas met, Yotis disclosed to Gasunas that he had lost his license to practice law. (*Stip.* ¶ 8.) According to Gasunas, Yotis told him that the reason he was disbarred was because he submitted expense reports for visiting an adult "gentleman's club." (*First Am. Compl.* ¶ 13.) Yotis denies having given this explanation at the time, but admits that he did not disclose the particular allegations of misconduct that actually gave rise to his disbarment years before the two first met. (*See Answer,* ¶¶ 13–14; *Stip.* 9).

Yotis had voluntarily removed himself from the Master Roll of Attorneys in 1997, losing his license to practice law, he did this after proceedings were initiated against him by the Illinois Attorney Registration and Disciplinary Commission alleging various misconduct, including the submission of false expenses and misappropriation of funds belonging to his clients. Those allegations were based on ample evidence described in the Statement of Charges filed concurrently with Yotis's voluntary removal request. (*See Stip.* 9; PX. 10, 11.)

Yotis also admits that he did not disclose to Gasunas that he had been criminally indicted for forgery in 2004, and had been charged in a separate civil suit filed by the Illinois Attorney General in 2001 against him individually and a company then headed by him, Professional Construction Services, Inc., with consumer fraud and deceptive business practices. (*See Stip.* 10; *Def.'s Final Arg.*, at 3; PX. 12, 13, 15 and 16.) Following determination of civil liability under the Illinois Consumer Fraud and Deceptive Practices Act, Yotis and Professional Construction Services, Inc., Yotis became personally liable for restitution to consumers for approximately $47,000.00, enjoined from performing remodeling and construction-related work, and ordered to pay a civil penalty of $50,000.00. (*See Stip.* ¶ 10; *Def.'s Final Arg.*, at 3; PX. 12, 13, 15 and 16.) That order was entered in October of 2008.

Yotis did not tell Gasunas about any allegations of fraud and related misconduct prior to or after he obtained a series of loans from Gasunas. (*See Stip.* ¶¶ 9, 10.)

## 2. Transactions Giving Rise to the Judgment.

The circumstances surrounding various transactions alleged by Gasunas to have given rise to the debt owed to him by Yotis were disputed by Yotis's testimony at trial. However, as noted earlier, the testimony of Yotis was not credible, and the testimony of Gasunas in describing the events that transpired was believable.

### a. City of Chicago Parking Tickets: May 2009

At some point in May 2009, and merely a few months into their friendship, the City of Chicago (the "City") impounded Yotis's car. Yotis asked Gasunas for the funds to have his car released. Yotis told Gasunas that he could not make the payment because the City required payment by credit card, which Gasunas did not have. However, there was an urgency to get his car back because Yotis needed to pick his father up at the airport.

As a result, on or about May 20, 2009, Gasunas paid $2,065.60 to the City of Chicago in order to have Yotis's car released. (*Stip.* ¶ 11.) It is unclear, based on the evidence produced at trial, what promise was made to repay Gasunas. However, it was "presumed that the parties all understood that repayment should be made." (*Def.'s Final Arg.*, at 7.) That loan appears to have been included in the Promissory Note, along with other transactions described below.

### b. U2 Tickets: Summer of 2009

In the summer of 2009, Yotis and Gasunas decided to purchase concert tickets at a discounted price and then resell at a profit. Yotis told Gasunas that he had a connection that would sell tickets a reduced cost.

Gasunas funded $2,500.00 for the purchase of U2 tickets. The parties disagree as to how many tickets this was intended to purchase. Yotis alleges that he also funded $2,500.00 for the tickets, and that Gasunas was to receive 50 of the 100 tickets. (*Def.'s Final Arg.*, at 8.) The parties dispute whether all profits were to be shared equally. Whether Gasunas ever saw the U2 tickets is also in dispute. Yotis declared that he gave half of the tickets to Gasunas to sell, while Gasunas testified that he never saw the tickets.

Gasunas requested and was given two tickets to attend the concert. However, Yotis gave Gasunas tickets that were not part of the block of tickets purchased. Gasunas testified

4

that Yotis said that their tickets had to be sold as a block to a potential ticket broker. No ticket stubs, invoices, or communications regarding the U2 transaction were produced at trial.

Gasunas claims that Yotis used the proceeds of the U2 tickets to purchase Super Bowl tickets. According to Gasunas, Yotis told him that instead of selling the U2 tickets as planned, he traded the tickets for the Super Bowl tickets, where he thought they would make a greater profit. (*Pl.'s Final Arg.*, at 3 ("In late 2009 or early 2010, Debtor told Gasunas that he (Debtor) could make a deal with the ticket broker to exchange the proceeds from the sale of 100 U2 concert tickets for four Super Bowl tickets").). Yotis, on the other hand, argues that "no evidence was presented to support the existence either of Super Bowl tickets or of any amount of proceeds from the resale of concert tickets." (*Def.'s Final Arg.* at 10.)

Gasunas testified that not only were the U2 tickets exchanged for the Super Bowl tickets, but the venture yielded a profit of approximately $10,000.00. Gasunas made efforts to receive his share in vain. On one occasion, Yotis told Gasunas the address of the ticket broker and agreed to meet with the broker and Gasunas. Yotis did not attend the meeting, nor did the ticket broker. Gasunas waited for several hours while Yotis failed to answer his phone. This interaction is also disputed by Yotis.

Ultimately, Gasunas testified that Yotis used the entirety of the profits, amounting to $10,000.00, to repair his BMW vehicle. No car repair invoices or bank statements showing the receipt or withdrawal of $10,000.00 were produced.

The events surrounding the U2 tickets transaction—the terms of the parties' agreement and compliance with these terms—remains unclear. However, Gasunas would make additional loans to Yotis in the months that would follow and Yotis eventually executed a Promissory Note, described in more detail below, which purported to memorialize all debts owed by Yotis to Gasunas when the Note was executed. Accordingly, any indebtedness resulting from the U2 tickets transaction were included into the total debt reflected in the Promissory Note. (*See* PX. 1 and 1A (transcribing the text of the Promissory Note) ("We agree to terminate and cancel all prior notes and this note shall represent the total amount due Tony Gasunas [sic] from Bill Yotis.")

5

Given the absence of clear evidence as to the terms of repayment or distribution of proceeds from the U2 tickets venture, and in light of the clear terms of the later-executed Promissory Note, any such debt is found to be included or settled by the Promissory Note, discussed in more detail below.

### c. Additional Advances and the Promissory Note

Gasunas made additional cash loans to Yotis from May 2009 through July 2010, adding up to $52,345.00. (*See* Promissory Note, PX. 1.) Gasunas evidenced these transactions with copies of his bank statements (*See* PX. 4, 5, 6.), and testified that several of these were cash advances requested by Yotis to make mortgage payments on his home, which he shared with his wife and daughter. According to Gasunas, Yotis told him that he (Yotis) feared his wife and daughter would leave him if he failed to maintain his home mortgage payments. Gasunas drew on his own home equity line of credit to provide cash to Yotis to stay current on his mortgage. Gasunas testified that Yotis showed him work related emails that made it seem like Yotis would have money to repay Gasunas soon.

Gasunas also testified that, in the spring of 2010, at Yotis's suggestion, the two men executed a Promissory Note to evidence and agree to amounts owed up to that point. Yotis does not dispute that he handwrote and executed the Promissory Note, and that the subsequent Judgment obtained by Gasunas was predicated on this Note. (*See Stip.* ¶ 4; PX. 1) According to Yotis, however, the Promissory Note was not intended to be valid and was executed by the parties knowing that its terms were false. (*See, e.g.*, Answer to First Am. Compl. ¶ 41.)

The handwritten Promissory Note, dated June 24, 2010, evidenced that Gasunas loaned Yotis a total of $49,945.00. (PX. 1; *see* PX 1A (transcribing text of handwritten Promissory Note).) Gasunas testified that Yotis drafted the Promissory Note. Yotis, on the other hand, testified that it was Gasunas who came up with the terms included, and later asked Yotis to write these terms as the Promissory Note. Yotis went on to testify that he signed the Promissory Note knowing that the terms were false and that he did not owe the asserted debt, and gave a wild explanation as to why he nonetheless signed the Promissory Note.

6

Yotis testified that the Promissory Note was hand written by him at Gasunas's request—not because the amounts therein were actually due—but as a favor to Gasunas, who needed to explain to his girlfriend why he had drawn those amounts from his home equity line of credit. The Yotis explanation is not credible.

The potential consequences of signing a false Promissory Note would have been clear to Yotis, a former attorney. His experience having been on the receiving end of forgery and misappropriation charges a few years earlier make his version of events much less likely, and make his explanation much less benign than it would be if another less sophisticated party claimed it as an explanation for signing what was in all other respects an enforceable agreement. Thus, the potential effect of signing the Promissory Note, which included very specific terms of indebtedness, pledged collateral as security and specified repayment terms for the debt asserted, would or should have been exceedingly clear to Yotis. It is hard to believe Yotis with the knowledge imputed to him based on his legal training and personal involvement in a number of previous fraud-based proceedings.

Other inconsistencies in Yotis's testimony are found in light of the evidence and his background indicating other instances of fraud-related misconduct (which were not disclosed to Gasunas) question veracity of his testimony at trial.

For example, after Yotis testified that the Promissory Note had been drafted to hide Gasunas's draws from his home equity loan account from his girlfriend, Gasunas's long-time girlfriend, then employed as a schoolteacher, was called as a witness for the purpose of challenging Yotis's version of the events given at trial. Gasunas's girlfriend testified that she had been in a relationship with Gasunas for many years, but she did not live with him and the two kept separate finances; she did not depend financially on Gasunas and owned the home she lived in subject to a mortgage in her name only. Her testimony was credible and consistent, and was not disputed by other trial evidence or in any way weakened by any other testimony given during defendant's cross-examination of her at trial.

Yotis's incredible version is contrasted with Gasunas's more plausible and consistent version of events; Gasunas's testimony was far more credible in light of the evidence and his demeanor when testifying during trial. His testimony is also supported by other evidence

7

that a number of loans were in fact extended. Yotis did not contend that he paid these loans, only that the Promissory Note was intended by the parties as a false document. However, Yotis's testimony claiming that no such debt existed at the time he executed the Promissory Note is unbelievable.

The obligation under the Note included a loan of $8,940.00 made to Yotis on June 24, 2010 supposedly for the purpose of paying an overdue mortgage bill, in addition to the amounts loaned up to that point totaling $40,905.00. The Promissory Note does not specify when the amounts constituting the $40,905.00 advanced up to that point were extended or the nature of those earlier loans. But such amount is stated to represent the total amount owed by Yotis to Gasunas up until the Promissory Note was executed, on June 24, 2010.

Under the Promissory Note, Yotis pledged his comic book collection and art collection (which the parties agreed existed and had some value) as collateral, along with an assignment of wages and commissions due to Yotis from Loop Construction and Cotton Construction, to secure repayment of amounts due. The Promissory Note specified that: (1) Yotis would pay the $8,940.00 to be extended by Gasunas, plus any interest and fees charged to Gasunas on account of such draw on his account, by July 10, 2010; and (2) Yotis would pay the balance of $40,905 by August 30, 2010.

An additional $2,500 was later included in a separate, undated document as due on July 7, 2010. This document also included the following signed promise by Yotis: "I will never borrow again." (PX. 1.)

Gasunas's description of the loans extended and later memorialized in the Promissory Note is credible in light of other evidence presented at trial. As earlier discussed, Yotis became personally liable for almost $100,000 in restitution and civil penalties in October of 2008, and was enjoined from performing the type of construction work he had been engaged in since losing his law license. The evidence suggests that Yotis was without work or looking for work when most of the loans were extended.

    **d.** <u>Other Loans</u>

Gasunas claims that, several months after the Promissory Note was executed and amounts due remained unpaid, he lent Yotis an additional $400 in order to travel to Detroit

8

to try to sell certain art work and his comic book collection. No documents evidencing this particular transaction were presented at trial. However, some emails between the parties discussed an increasing balance on the total debt owed by Yotis to Gasunas from the amount initially reflected in the Promissory Note. (*See* PX. 7 and 7A.)

### 3. Gasunas's Efforts to Collect

Yotis failed to make any payment to Gasunas by the deadlines set in the Note or thereafter. In fact, no payment on account of any debt owed by Yotis to Gasunas was ever made. Gasunas repeated emails included reference to the balance owed by Yotis to him, and included repeated requests that Yotis contact him by phone or otherwise to discuss the debt due support Gasunas's claims that Yotis owed and failed to pay back such amounts. (*See* PX. 7 and 7A.) Gasunas produced emails beginning in December 2010 through August 2011 attempting to contact Yotis. (*Id.*) Gasunas would subsequently file the state court action which gave rise to the Judgment for amounts due under the Promissory Note.

On December 11, 2011, Gasunas filed a verified complaint against Yotis in the First Municipal District of Cook County for breach of contract under the Note, case number 11-M1-179067. (*Stip.* ¶ 4; PX. 2.)

On April 25, 2012, Gasunas obtained a judgment by default against Yotis on the breach of contract claims for $52,345.00, plus costs of $337.00, totaling $52,682.00. (*Stip.* ¶ 5; PX. 3.) No effort was made by Yotis to set aside that Judgment.

On January 29, 2014, Yotis filed his petition for relief under chapter 13 of the Bankruptcy Code. This adversary proceeding followed. Gasunas seeks a determination that the Judgment is nondischargeable in Yotis's underlying bankruptcy case.

Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### I. JURISDICTION AND VENUE

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157, and this proceeding is

thereby referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). It seeks to determine the dischargeability of a debt. Therefore, it "stems from the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge. *Stern v. Marshall*, 131 S.Ct. 2594, 2618, 180 L. Ed. 2d 475 (2011).

## II. DISCHARGEABILITY OF DEBT

The discharge provided by the Bankruptcy Code is meant to effectuate a fresh start for the "honest but unfortunate debtor." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *Mayer v. Spanel Intl. (In re Mayer)*, 51 F.3d 670, 674 (7th Cir. 1995). Debts in bankruptcy are presumed dischargeable unless proven to meet the requirements of a statutory exception. *In re Berman*, 629 F.3d 761, 765 (7th Cir.2011); *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000). The burden of proof consequently rests with the objecting creditor, who must demonstrate nondischargeability by a preponderance of the evidence. *In re Cohen*, 507 F.3d 610, 613 (7th Cir. 2007); *Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992).

### A. Count I: 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt obtained by "false pretenses, a false representation, or actual fraud . . ." 11 U.S.C. § 523(a)(2)(A). In this case, Yotis has acknowledged that he signed the Promissory Note, and does not dispute that the Promissory Note is the basis for the state court Judgment.

#### 1. Actual Fraud, False Pretenses, or False Representation

To except a debt from discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. *Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 669 (Bankr. N.D. Ill. 2010). The fraud exception to dischargeability of debts does not reach constructive frauds, only actual fraud. *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000). While there is no definite rule defining fraud, "it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d

10

at 893 (citing 4 Collier on Bankruptcy para. 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)).

To except a debt from discharge based on false pretenses or false representation, the creditor must prove that: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010).

While misrepresentation are often express representations, false pretenses do not require an overt statement and can include "implied misrepresentations or conduct intended to create or foster a false impression." *Nite Lite Signs & Balloons, Inc. v. Philopulos (In re Philopulos)*, 313 B.R. 271, 281 (Bankr. N.D. Ill. 2004). Thus, "'[a] debtor's silence regarding a material fact can constitute a false representation.'" *Deady v. Hansen (In re Hanson)*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (quoting *Health Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 157 Bankr. N.D. Ill. 2009) (citing *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).

### 2. Intent

Scienter, or the intent to deceive, is also a required element under § 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud. *Mayer*, 51 F.3d at 673. Intent to deceive is measured by the debtor's subjective intention at the time of the representations or other purportedly fraudulent conduct. *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002). Intent to deceive may be established through direct evidence or inference. *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D.

Ill. 2005) (internal quotations omitted). Thus, "[w]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

### 3. Reliance

False pretenses and misrepresentation both require that the creditor actually rely on the debtor's omission or misrepresentation. *Ojeda*, 599 F.3d at 717. This reliance must be "justifiable." *Field v. Mans*, 516 U.S. 59, 73-75 (1995); *Mayer v. Spanel Int'l*, 51 F.3d 670, 673 (7th Cir. 1995). Justifiable reliance is a less demanding standard than reasonable reliance and "does not mean that [the objecting creditor's] conduct must conform to the standard of the reasonable man." *Stern v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (quoting *Field*, 516 U.S. at 71). Rather, justifiable reliance "requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda*, 599 B.R. at 717 (quoting *Field*, 516 U.S. at 71).

Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of the creditor and debtor. *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (quoting *Field*, 516 U.S. at 70). "However, a plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods." *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007).

### 4. Application of evidence to the law

Over the course of approximately one year, from May 2009 to June of 2010, Yotis solicited and obtained a number of loans, and extensions on those loans from Gasunas. The pattern of misrepresentations and omissions during the course of this period suggests that Yotis engaged in a calculated scheme to defraud Gasunas.

Yotis's complete omission of his history of fraud-related conduct, including the criminal and civil charges filed against him, coupled with repeated requests for loans from

Gasunas, which were never paid back, casts doubt on Yotis's intent when the loans were obtained to ever repay those loans. Extensions and forbearances on payment on those loans were obtained by conduct and representations by Yotis intended to foster a false impression that all loans would soon be paid.

Although Yotis told Gasunas that he had lost his license to practice law, he failed to disclose the allegations of fraud and other misconduct made against him at the time. Yotis admits that these charges, which included misappropriation of client funds and submission of false business expenses, were never shared with Gasunas. Gasunas testified that he would not have agreed to make the various loans if he had known the reason why Yotis was disbarred. Gasunas's testimony that Yotis told him he had lost his law license for submitting false receipts for going to gentleman's clubs is credible.

More recent incidents of fraud-related misconduct or allegations of misconduct, were also kept from Gasunas. The Office of the Illinois State Attorney General charged Yotis with violations of the Consumer Fraud and Deceptive Business Practices Act and the Home Repair Fund Act. Liability resulted in a restitution order of $47,195 and a civil penalty of $50,000, and an order permanently enjoining Yotis from engaging in the sale of a home repair, improvement, or other construction services on October 16, 2008. (PX. 13.)

Yotis was also indicted by the State of Illinois for forgery. He was sentenced after pleading guilty and was ordered to pay restitution of $65,770.74. The indictment was filed March 22, 2006, before or around the time the parties appear to have first met, and the guilty plea and sentencing was entered on March 31, 2009, shortly before Yotis began requesting loans from Gasunas. (*See* PX 15, 16.)

The timing is also telling. About seven months before the first loan was requested, Yotis was found guilty in civil litigation with the Office of the Attorney General for fraudulent activity and, shortly before the loans were obtained, Yotis pled guilty in a separate criminal suit for forgery. Both events had financial consequences for Yotis and his ability to repay the loans obtained from Gasunas.

Yotis also engaged in a series of calculated efforts to improve Gasunas's confidence in Yotis in order to entice loans. For example, Yotis omitted to tell Gasunas that he was on a

work release program that required him to sleep in jail. Moreover, Yotis showed Gasunas work related e-mails to persuade Gasunas that Yotis would be able to pay both the past indebtedness and new loans as a result of new job opportunities.

Yotis appealed to Gasunas's empathy by telling Gasunas that if he did not stay current on his mortgage, his wife and daughter would leave him. Yotis also had employment related mail including rejection letters sent to Gasunas's home, which Gasunas had not requested. (PX. 8, 9.) It is unclear that any of the money loaned was used to pay the Yotis mortgage. Yotis admitted to having last paid his mortgage on February 2010, but Gasunas continued to loan Yotis money until June 2010. To further entice Gasunas, a layman, to loan additional money, Gasunas, a former attorney, suggested and then drafted the Promissory Note. This evidence tends to corroborate Gasunas's version of the events and supports the claim that it was Yotis who suggested and drafted the Promissory Note.

Thus, considering the totality of evidence, Gasunas has met his burden of showing that the loans and consequent debt at issue in this case was obtained by misrepresentations, false pretenses and fraud to satisfy the first element of § 523(a)(2)(A).

It is also held that Gasunas has proven, by preponderance of the credible evidence, that Yotis possessed the requisite fraudulent scienter at all times when the debts were incurred. The circumstances surrounding the relationships and the transactions provide ample indicia of Yotis's intent to defraud Gasunas. This clearly was a scheme created by Yotis to defraud Gasunas. The timing of the friendship, the omissions, and the calculated misinformation were all used to obtain further loans from Gasunas.

On multiple occasions, Yotis promised to repay Gasunas, but made no attempt to do so. Gasunas loaned Yotis money to get his car back from the pound because of a self-manufactured emergency. Shortly thereafter, Yotis solicited more money from Gasunas for the purchase of U2 tickets. Again, Gasunas did not repay Yotis or share the profits. Yotis continued to borrow money from Gasunas, each time with new stories and excuses. It must be inferred that Yotis continued to make these promises to Gasunas without any intention of keeping them.

Yotis also testified to his wild explanation concerning the Promissory Note. He said that no debts were due, but Gasunas needed the Note to explain to his girlfriend why he was drawing on his home equity line. Both Gasunas and his long-time girlfriend, Camille Koch, testified that they kept their finances separate, so she would have had no reason to need an explanation in the form of a promissory note from Gasunas as to why he was drawing on his home equity line. (*See Pl.'s Final Arg.*, at 10.) Yotis argued that there was "no rational reason for [Yotis] who [] benefited from such largesse to suddenly ask permission to document it in writing." (*Def.'s Final Arg.*, at 14.)

From the foregoing events, it is also possible to infer a subjective intent to deceive. The timing of the transactions, immediately after becoming friends when Yotis's car was impounded, Yotis having been disbarred for fraudulent activity, and Yotis having been found guilty for consumer fraud and for forgery in two separate suits, only heightens the inference that Yotis had no intention of repaying Gasunas, and instead devised a scheme full of misrepresentations and omissions to continue borrowing from Yotis with no consequences or repayments. Yotis is educated, with a juris doctor, and he practiced law for a number of years. Moreover, at the time of the transactions with Gasunas, Yotis had already abused his knowledge as an attorney, resulting in the loss of his license to practice law.

Yotis knew or should have known that Gasunas would not have lent him money and continue to loan him money had Yotis revealed the true cause for his disbarment, the reasons why he needed the loans, and his intention not to repay any of the loans. Yotis's only reason for not disclosing this information to Gasunas was to induce Gasunas to continue to lend more to him. Yotis's efforts to minimize the role his statements and to shift blame to Gasunas is not persuasive. Apart from his own self-serving testimony, the record does not include evidence that Yotis had any intent, preparation or ability to ever repay Gasunas.

When the Court looks to totality of the circumstances it is clear that Yotis' actions constituted a "'deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat'" Gasunas. *McClellan*, 217 F.3d at 893 (citations

omitted). As in *McClellan*, this is "a good description of what the debtor is alleged to have done here." *Id.*

Finally, the evidence showed that Gasunas actually relied justifiably on Yotis's false representations. "[D]irect evidence is not critical." *Bank of Commerce & Trust Co. v. Strauss (In re Strauss)*, 523 B.R. 614, 630 (Bankr. N.D. Ill. 2014). Reliance can also be proven through circumstantial evidence. *First Nat'l Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372, 375 (7th Cir. 1983) ("[B]ecause direct proof of actual reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance."). The circumstances here warrant a finding of actual reliance.

Gasunas's reliance was also justifiable. Justifiable reliance is a subjective standard dependent on the circumstances of the particular case and the characteristics of that unique plaintiff. Gasunas is a layman. There was no evidence that Gasunas had any experience with personal loans or business arrangements like the one he had with Yotis prior to meeting Yotis. Gasunas was entitled to assume that a friend with whom he shared a personal relationship with, whose wife was also a friend, would repay him. Nothing in communications between the parties or the language of the Promissory Note, as suggested by Yotis, made it "readily apparent" that Yotis had no intention of repayment. *Ojeda*, 599 F.3d at 717. Similarly, nothing in the record made it readily apparent that Yotis was using the funds earmarked for payment of his residential mortgage for anything other than his mortgage.

No one knowingly loans someone money if they have no expectation to be repaid. In this case, the execution of the Promissory Note was actually an exercise in futility. Had Gasunas known that he would not be repaid, he would not have accepted a document that included the old and the new debt. Gasunas clearly accepted the Note because he thought he would be repaid. It was not until Yotis failed to repay Gasunas for six months that the Promissory Note was executed. Gasunas justifiably relied on the Promissory Note, which was a new agreement between the parties for payment of the old and new loans.

Yotis argues that he was not trustworthy, and Gasunas should have known not to trust him and therefore any reliance was not justifiable. Yotis wants a finding that because

16

he failed repeatedly to repay Gasunas in a timely manner after each of the loans, that he should not be held accountable. The argument of a true con man: "He was so rotten no one should have trusted him." Rather Yotis's dishonest actions show the art of his elaborate scheme aimed to defraud Gasunas. With every failure to repay, Yotis had a new excuse for another loan.

The absence of documentation prior to the Promissory Note did not raise a red flag to Gasunas, a layman. Once the Note was executed, he had no reason to expect nonpayment because he believed Yotis to be a friend who would repay him according to terms of the Note. Moreover, Gasunas did not continue to loan Yotis money after Yotis failed to make the payments under the Note by the due dates. Although a plaintiff cannot ignore obvious "red flags," *Taylor v. Sykes*, 2005 WL 3542520, at *3 (N.D. Ill. Dec. 22, 2005), "[n]o case holds that a creditor's reliance is less than justifiable when, the fraudulent misrepresentation or omission aside, the creditor was bone-headed to have dealt with the debtor in the first place and would have been better off walking away." *Strauss*, 523 B.R. at 632.

Given the facts adduced at Trial, the evidence on the record and this Court's independent analysis of witness credibility, it found that Gasunas has established elements for actual fraud pursuant to § 523(a)(2)(A). In addition, Gasunas has met his burden to show that he actually and justifiably relied on Yotis's misrepresentations and omissions, and therefore also met the standard for false pretenses and misrepresentations pursuant to § 523(a)(2)(A). Yotis made, with knowledge of their falsity or reckless disregard for the truth, misrepresentations of fact to induce Gasunas to loan the money subject to the state court Judgment.

Therefore, the Judgment debt is nondischargeable pursuant § 523(a)(2)(A). Judgment under Count I pursuant to § 523(a)(2)(A) shall be entered in favor of Gasunas.

### B. Count I: § 523(a)(2)(B)

Section 523(a)(2)(B) of the Bankruptcy Code excepts from discharge any debt obtained by (1) a statement in writing made by the debtor; that (2) was materially false; (3) concerning the debtor's financial condition; that (4) the debtor intended to deceive the

17

creditor; and (5) the creditor justifiably relied on the statement. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995).

Putting aside any other flaws of the § 523(a)(2)(B) claim here, the proof lacks a critical element: a written statement "respecting the debtor's financial condition." 11 U.S.C. § 523(a)(2)(B). To satisfy § 523(a)(2)(B), the statement must do more than just prompt speculation about the debtor's finances. It must be "sufficient to determine financial responsibility." *In re Price*, 123 B.R. 42, 45 (Bankr. N.D. Ill. 1991). In the case of an individual, for example, "statements of income and expenses or schedules of assets and liabilities" will qualify. *Id.* Transactional documents that merely imply a certain financial status, on the other hand, will not. *See, e.g., Williams v. United States*, 458 U.S. 279, 284 (1982) (holding that a bad check was not a "false statement" for purposes of criminal statute and noting that "a check is not a factual assertion at all"); *In re Segal*, 195 B.R. 325, 332 (Bankr. E.D. Pa. 1996) (finding lease and promissory note insufficient); *City Fed. Sav. Bank v. Seaborne (In re Seaborne)*, 106 B.R. 711, 714 (Bankr. M.D. Fla. 1989) (finding loan closing documents insufficient).

Gasunas argues that the Note and various e-mails were writings that constitute false statements of Yotis's financial condition. However, no document was "respecting the debtor's financial condition." An e-mail indicating that Yotis might get paid in the future is not a statement about his financial condition. Moreover, the e-mails produced were written after the debt was created and do not mention the Debtor's financial condition. The Promissory Note itself makes no mention of Yotis's financial condition. It simply contains a promise to grant a security interest in return for a loan. "Inferences that might be drawn . . . are not enough." *see also Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 710 (Bankr. N.D. Ill. 2004) (on a motion to dismiss, finding that the alleged documents did not amount to a statement respecting the debtor's financial condition). Therefore, the elements required under § 523(a)(2)(B) were not met. Judgment as to § 523(a)(2)(B) on Count I will be entered in favor of Yotis.

### C. Count II: 11 U.S.C. § 523(a)(4)

Gasunas's final basis for relief concerns a debt alleged to have arisen from the joint venture to purchase and sell U2 tickets. Gasunas claims a right to certain profits from that venture, and argues his lost profits (claimed to be approximately $10,000) constitute a nondischargeable debt under § 523(a)(4).

Section 523(a)(4) bars the discharge of debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Gasunas argues the lost profits from the U2 tickets joint venture gave rise to a debt for embezzlement or larceny.

Embezzlement means "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Matter of Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). "To prove embezzlement, the creditor must show ... that (1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit." *Id.*

Larceny is proven for purposes of § 523(a)(4) if a debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to his own use without the owner's consent. *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991). "Embezzlement differs from larceny only in that the original taking was lawful, or at least with the consent of the owner, unlike larceny, where there is a requirement that felonious intent exist at the time of the taking." *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 703 (Bankr. N.D. Ill. 2002).

In this case, Gasunas testified that he entrusted $2,500 to Yotis to purchase the U2 tickets, but Yotis never gave him the tickets or profits from the sale of those tickets as originally agreed. Because Gasunas alleges that he gave the original funds to Yotis, and that Yotis was to purchase the tickets but later misappropriated the profits from those tickets, the elements of larceny—a wrongful taking of property from its rightful owner—have not been established.

While an embezzlement—misappropriation of entrusted property—were alleged and Gasunas testified to that effect, no other evidence to support the parties' initial agreement as to distribution or to show the amount of profits obtained by Yotis was presented. Even if

Gasunas's testimony that the profit amount was around $10,000 was presumed to be true, his share of that amount is not clear.

More importantly, the funds loaned to purchase the U2 tickets and any debt owed as a result of that venture has been found to have been included into the total debt stated in the Promissory Note, or settled by it. (*See* PX. 1 and 1A (transcribing the text of the Promissory Note) ("We agree to terminate and cancel all prior notes and this note shall represent the total amount due Tony Gasunas [sic] from Bill Yotis.") Accordingly, Gasunas has not shown an independent debt due as a result of that transaction.

To the extent it is argued that an independent basis for dischargeability of that debt exists, the Court finds the evidence to be insufficient to establish the elements of an embezzlement for purposes of § 523(a)(2)(A) by preponderance of the evidence. Judgment on Count II will therefore be entered favor of Yotis, the defendant.

## CONCLUSION

For these reasons, relief on Gasunas's First Amended Complaint will be granted in part and denied in part. Judgment will be entered in favor of Gasunas on Count I, pursuant to which the debt that arose from the state court judgment is declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Relief will otherwise be denied. Judgment will be entered separately in accordance with this opinion.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ___ day of March, 2016

MAR 28 2016